Good morning, Mr. Chief Judge Traxler, members of the Court, and may it please the Court, my name is Bill Porter and I'm here today for the petitioner, Feld Entertainment. With me in court this morning is my colleague, Lori Proctor. The issue in this case is whether the District Court erred in submitting a breach of contract case to the jury and thereafter denying a Rule 50 motion. When the undisputed evidence trial established that Feld, as the director and producer of a contract with two performers who were to perform two discreet horse acts, the sole and exclusive right to set the order of it show, and the evidence also established that the performers refused to perform as directed when they had trouble with one of their horses. The District Court's decision to submit the case to a jury was an error because the Donnert's breach of the agreement at issue justified their discharge. The District Court also erred in giving two instructions to the jury. One had to do with the implied duty of good faith and fair dealing, and the second instruction involved Feld supposedly interfering with the Donnert's ability to perform their contract. The Donnert's position for both of these instructions was based on their contention that there was a shared safety clause that was implied in the contract between the parties that required Feld to reorder its show. But the contract contained no express or implied shared safety clause, and Feld, as a matter of law, had the right to order its show. And when the Donnert's refused to... What was the provision in the lease relating to safety? That's what they latched on, right? Yes, sir. What was that clause? That was 7C. Right. What did that provide? That provision provide, I've replaced lessee with lessor because it gets a little complicated, but it's that the Donnert's also acknowledged that safety is of paramount important concern to Feld as it relates to animals, the public, and Feld's animal care and other staff. And the Donnert's will take all necessary steps to ensure such level of safety. The Donnert's also agree to make necessary revisions to the handling of the animals in a timely manner in order to ensure such compliance, and Feld agrees to work with the Donnert's to facilitate compliance. Let me ask you, do you think, in a hypothetical circumstance where there was a clear issue of safety about the animals, the performers, or the public, that that would temper Feld's ability to control the performance? I do not believe that section 7C speaks to performance issues at all. I believe... Well, it talks about safety, right? Well, sir, it does talk about safety, but I don't believe that it talks about safety in those general terms. I think that if you look at section 7 as a whole, and it speaks to, that Feld has, and the Donnert's recognizes handlers of animals... Let me ask you this, regardless of what it means, do you think that clause, if there were a hypothetical that would bring it into play, that that clause would temper Feld's overall control of the performance? I do not, because, again, I believe that section 7C speaks, as it says here, to the handling of the animals, and with respect to the regulations that apply to the handling of animals. There's international, there's local, there's state, and it talks about the care and the feeding of the animals. This here speaks to, 7C, Your Honor, speaks to animal care, and the Donnert's revising their approach to the handling of their animals. Well, I don't want to get into the contentions. I was trying to understand the theoretical question, because it seems to me your argument depends on whether the Feld's control over the performance is absolute. If it is, then no facts that they could put on in this regard could temper it. My suggestion is that if 7C does temper the Feld's control, then might there not be a dispute, a factual dispute that could be resolved by a jury? And your answer is, 7C does not temper the overall control. That is my position, sir. And if you look at the provisions of the contract that we're talking about here, in the employment contract, it required the Donnert's to perform in a first-class, professional manner under the supervision, direction, and control of Feld as a horse-riding act with juggling acrobatics and a comedy horse-riding act. In the lease, the Donnert's represented that they had the experience and know-how to train and present animals in a live circus production, and it also required the Donnert's to have their acts ready for presentation throughout the show. The addendum also confirmed, again, that the Donnert's were required to perform in a first-class, professional manner. But you did have some obligation to work with the Donnert's over the question of the safety of the animals, did you not? Well, to the extent that any such obligation arises, I don't believe it comes from Section 7C. If Your Honor is suggesting that there may be a general idea that parties have to work together, perhaps. I don't think that was an issue here because, again, I think the fundamental point here is that the only issue, I won't say issue, the only solution that the Donnert's ever came up with to deal with this perceived safety issue was changing the order of the show. Now, if they had come to Feld and said something like, there's a lesser remedial measure that we can do, maybe we'll do the act in a different part of the ring, or maybe we won't do this particular trick, could they have worked together, perhaps? But the evidence was undisputed at trial that the only suggestion, their position was, we cannot perform this act unless you change the order of the show. And with respect to the order of the show, the contract vests entire control to Feld as the producer. Well, let me just go back. I don't mean to press a dead horse. I just need to understand the theoretical dead horse with respect to your argument. The question is, if the order of the show creates an unsafe condition for the animals and ultimately for public and other people, wouldn't Feld have to yield on that? If Feld believed that there was a safety issue that had some impact on the other animals or of the performers or of the customers, then I suspect that it would have acted. But there was no evidence here. I understand the evidence argument. My question is still a contractual question. So that 7C does read as a level of temperance to the overall control. In other words, Feld didn't have absolute control. They could not create a performance in which the animals were put into such a position where they fought each other, so to speak. Well, I still believe that would have been within the sole control of Feld as the producer and director of the show, having reserved that right to itself. But it was their issue. It was reserved to them. 7C, I understand Your Honor's position, but I don't think that 7C speaks to the issue of safety within a performance. I think 7C, when you look at it in terms of 7A, B, C, and the rest of the provision. You don't think safety of animals could be implicated during the course of a performance? Absolutely I do. But I don't believe that that's what 7C speaks to. What's it say, basically? What limits it? What clause in that 7C says this does not cover the treatment of animals during the course of the performance? 7C speaks to animal care and the Donnards making revisions. Remember, all of the obligations in 7C are imposed upon the Donnards except for the very last one where Feld says it will work together with them to assure compliance. And I believe that that compliance relates to the handling of the care of the animals as reflected in the other provisions of Section 7 that discuss the international, federal, state, and local regulations with respect to the care and handling of the animals. 7C, I don't believe, speaks to the performance issues. So there are two different issues here. There's the issue that the Donnards rely on with respect to this, what they call a joint shared safety provision, which I believe is a stretch of the provision itself. And then there's the issue of safety separately, which Feld was certainly happy and willing to address to the extent that they had, they believed there was a safety issue. But they never, the evidence was clear, they never believed that there was a safety issue and that's what the district court found. He said there was never any evidence that this course couldn't, excuse me, that the act was inherently unsafe or that the act could not be performed. The only evidence was that this, I think his quote was, cornbread had trouble doing it. So I don't think you need to get to the broader issue. Wasn't it a safety issue if the noise prevented the animals from performing and it was driving the animals to bizarre acts and whatever? Why isn't that a safety issue? I believe I spoke over the first part of your question. Was your question, why was the noise not a safety issue? Why is the order of the, why was the order of the show here and the performance of the horses in the Comedy Act after the Tiger Act, why in your view is that not a safety issue? Well, two reasons, sir. One is that this is the type of production that happens all the time in the circus environment. This is, they're not performing in a library, they're performing in a circus where there are wild animals all around with cannons and clowns and all sorts of things. And when the Donnards made the representation that they could work and train their animals in a live circus environment, that was a representation that Feld believed when it made the decision to hire them and put them in the show. Secondly, with respect to the noise, you have to remember, Your Honor, that the way this horse act worked, it always followed the tigers. There were a number of passes, this is, perhaps it's in the facts for sure, but there were a number of passes for this one particular Comedy Act. It came in the first act, wandered through as a wandering cowboy. It came in in the second act immediately following the tigers. It always followed the tigers, and it did a little comedy act there, and then it went off again, and then it came back again and did its comedy routine. That was the first order of the show before it was changed. When it was changed, the only difference is the horses still came in right after the tigers, but there was a gap in between that performance, the one right after the tigers, and the next one when they did the full comedy routine. And in the interest of time, they reordered the show and collapsed the full comedy routine so it combined with that pass that had always followed the tigers. And the issue was simply the sound of the cage was loud, and the evidence at trial was that they could see the tigers too, right? I'm sorry, sir? The suggestion was that the horses could see the tigers too. And that was always the case. I thought you said there was a gap under the original arrangement. No, sir. Always the horses rode right past the tigers as they were being wheeled out of the cages. That was reflected in the videos that were played at trial that in the original order of the show and in the second order of the show, the horses always rode right past the tigers as they were being The jury saw this as a safety issue? Well, it's unclear what the jury saw this as because we believe that the jury should not have been instructed on good faith and fair dealing and on the issue of whether or not failed preventive performance. I think once it went to the jury, the jury could decide anything that they wanted, which is why we think it was error for the issue to go to the jury in the first place. Because the contract Was the question posed to the jury as to whether this was a safety issue? No, sir. Was it covered in the instruction that in order for there to be recovery, the jury would have to find that this involved safety? No, sir. Did you ask for that instruction? I did not ask for that specific instruction. Why wouldn't you? The district court judge, we had extensive argument on the Rule 50, and the district court judge determined that he was going to instruct the jury as he saw fit on the issue of good faith and fair dealing. Good faith is different from what Judge Wilkinson is asking. Judge Wilkinson is asking about the safety. Good faith, the judge's instruction was a canned instruction saying there is no change in any obligation or provision of the contract. It's just that when you do something under the contract, you have to do it in good faith and not with some secret intent to do something else. And I must say to elevate the good faith instruction as you have as the error in the case is a very, very weak argument. I don't even know if it's a legitimate argument. But I think the question that Judge Wilkinson is asking was the safety question presented to the jury either in the instructions or the oral argument.  See, I don't understand that, and I don't understand because in order to recover under the contract and in order to establish a breach of contract, you would have to establish for purposes of 7C that there was a safety issue involved. And I want to know whether you requested an instruction that posed to the jury the question of whether under this contract there was a safety, this was a matter of safety. I'm not sure one way or the other whether it's a matter of safety. I could see it both ways. But if I were on your side of the case, I would request that as an instruction and say, oh, if this were a matter of animal safety, it would be of the highest and most paramount concern. But this was not a matter of safety. It wasn't a matter of safety. It was a matter of preference. And unless the jury finds it to be a matter of safety as opposed to preference, then that's – but you didn't ask for that. To answer your question directly, no, sir, I did not ask for that. Our issue with the Rule 50 motion was that the evidence at trial was that Feld had the sole control over the order of the show. And that's fair enough. But if the district judge is not buying that, then why wouldn't you try to recoup in the instructions? Well, if I could address the district court not buying it comment, I believe the district court judge was buying it. I think he made reference throughout the transcript that he thought that the ruling I don't say you shouldn't have raised the earlier argument. I'm just saying if the district court wasn't going to go with you on Rule 50 and go with you as a matter of law, you at least had a shot on the question of safety before the jury. May I answer your question, sir? As I understood what the district court was saying, he was saying that he did not believe that the contract imposed the duty that the Donards believed it imposed with respect to safety. It's my understanding that in the way the evidence was presented, and I believe that he agreed with this, was that since Feld had control of the order of the show and the Donards' only complaint or the only suggestion to fix the issue had to do with changing the order of the show, which the contract vested solely within the realm of Feld's responsibility, that there could be no verdict other than for Feld. Because, Judge, I think it would be different. It potentially could be a jury question if the Donards had said something like, well, we could have done this, or we could have done this, or we could have done this, lesser remedial measures. But the evidence was they would not perform so long as their act followed the Tigers. And that is one thing that the contract vests sole control in Feld. And so the issue of whether they worked with him, and there was, we contend. Unless it was a safety issue. Unless it was a safety issue. I'm sorry. They said they have sole control about the order, but I'm suggesting that unless it was a safety issue. And 7C, while it says lessors have the duty, they're carrying out the duty as imposed on the lessees, by the lessees, because the lessees are highly concerned about the safety, including safety of the public, which suggests that that safety means during performances. I understand your position, sir, but I get back to the point that there was never a safety issue that was proven at trial. The district court said during the Rule 50 argument that there was no evidence that this act could not be performed. It was just that this particular horse had trouble with it. And remember that. Who's to determine whether the horse wasn't reacting to the Tigers as opposed to something else? But again, this is a contract. I mean, this is a contract for an act that Feld went out and got an act to perform. And within the contract, the Donnards had the sole responsibility to staff, if you will, the act. So if they didn't have a horse that worked, this wasn't a contract for Cornbread. It wasn't a contract for Suarez. It wasn't a contract for Bearclaw. It was a contract for performers to present and perform an act. And the contract is clear that to the extent that these performers had issues with their horses, it was their responsibility to solve it. Except it's their responsibility to satisfy the lessee's concern. That's what's stated in there, and that's the part that I wanted to emphasize, because I do believe it is a safety concern involving performance that the lessee has. And the lessor has the duty to do that, and if it's brought to the performance of the lessee, then they're supposed to work together on that to try to resolve it. But I can't believe that, for instance, in the middle of a Tiger performance, Feld could instruct that cannons be fired in celebration, or fireworks be fired up through the roof of the place and have loud explosions where the animals become startled. I mean, there seems to be a lot of common sense in this, and clearly Feld is the control of the performance. But if it was pointed out that their order was unsafe for the animals, the public, or the circumstances, then it seems to me that might be an exception to the overall control. May I respond? Yes, please. Two responses there. First of all, there was no evidence that things like that were going on, or the loud noises and the like, or that Feld didn't work with them. The cage was being dismantled. The cage was being dismantled. The other part to that, Your Honors, I think perhaps that could be a scenario where the instruction on preventing performance might be appropriate, but there was no evidence here that that was the case. Instead, all of the evidence was that Feld did everything it possibly could to work with this act. It said, we'll give you more time to practice. Let's pull it off for a while. Let's see what else we can do. We're going to do what we can to make the strike of the cage, it's called, quieter. Well, speculate with me for a moment. Yes, sir. Speculation is useless, you know, but might as well ask you, what did the jury do when it made an award in this case? As far as why they ruled what they did? You're asking me to speculate? Speculate. This is just pure speculation. I think that they felt badly for the performers, and you had a corporate entity on one side who was a big circus production, and you had two horse trainers from Czechoslovakia. So you think it was just a sympathetic verdict? Yes, sir. Okay. Thank you. Mr. Pierce. Good morning, Your Honors. My name is Wayne Pierce. I'm here representing the plaintiffs and cross appellants, Robbie Donnard and his brother, David Donnard. I'd like to resume the discussion on the points of the appeal, and then I'm going to transition into my cross appeal shortly. As to the questions that have been posed now regarding what I believe is the key issue in this case, which was the safety. Could you raise the microphone and speak a little louder? I want to be sure I catch every word. I'll do my best, Your Honor. As to what I believe is the safety issue, the chief issue, which is the safety issue that's been posed, Judge Niemeyer, going to your point, under this paragraph 7C, that clause when read in a reasonable manner allows my clients to assert that there was a legitimate safety obligation that was placed upon Feld as the employer. He argues that there was no evidence of a safety issue. What's your response to that? I'd say that's not the trial that I was at for four days. What was the evidence of the safety issue, the manifestation of a safety concern? The safety concern was that once they changed the show order and the cage was being struck in the dark, two factors, the loud noises from the metal banging and the residue from the tiger scent, because tigers don't control their bodily functions and they leave lots of scent, and horses, as prey animals, react to that. And those two things, scent and noise, caused this horse, when it was placed in its most vulnerable position, and that's what's different about the prior show order, in the prior show order the horse just walked through. Well, the horse had full control of itself. But in its most vulnerable moment, when the horse lays down on its side in a very exposed way, a blanket is placed over him as if they were going to sleep, and then David Donnard lays down next to the horse, that horse would come up out of there prematurely. It actually stepped on David Donnard's foot. It bit him. And the fear was, we aren't going to be able to control this animal. This animal is reacting. It's doing things that it's never done before. It has a long history. It had been trained for a long time. It was doing things that it had never done before, and it was because the show order that they had adopted had never been done in the circus industry, and that was the testimony in this case. There was no evidence. In fact, my clients, who are fifth-generation circus performers, we go back to the 1840s in the country of Hungary, working with horses year after year, and their testimony was that no circus had ever done this. The only circumstance where you will ever see a Tiger Act preceding a horse act is when they have spent years, literally, raised from birth so that the tiger and the horse were right next to each other, and they learned to live with each other over a course of years. And we know that because the Donnard's cousin, the gentleman's name happens to be Caroli, and that was the name of one of the Donnard's horses, named after their cousin, had done that and was more or less the only circus professional who had ever had a horse act that would follow a Tiger Act, and that's because his secret was he had raised them from birth, and it took years to get to that performance. No circus had ever done what they were trying to do. So did the, did Feld take any steps to muffle the noise and to stifle the scent? Feld's actions, they did take some limited efforts in order to control the noise. They did not eliminate the noise. They instructed their individuals to, you know, be more cautious, but it did not eliminate the noise. They claimed that they put softer carpeting in and retrained the crew so that they, that there wouldn't be the sense of alarm. Okay. Well, the first part of that, I don't think there's a factual basis regarding a softer carpet. There was no testimony regarding that, and that would have not been a remedy for what the, for the scent and for the noise. Now, the other part of it, they instructed, they asked their guys to be gentler, kinder when it came to disassembling or striking this tiger cage. There seems to be a bit of a difference in the reaction of bear claw and cornbread. And as of the two horses, the one that was most allergic to the Tiger Act, I guess, was cornbread. Am I right about that? Well. Of the two. Bear claw was never asked to perform. He was brought out and he did walk-throughs. So Fell says, well, we have the alternative here. You can perform the comedy act with bear claw and we will, and you, they did a juggling act too, didn't they? The Donnerts? Yes, Robbie Donnert did a juggling act. So Fell says you can continue to perform your juggling act and you can perform the comedy act with bear claw and leave cornbread out of it. Would that have been a satisfactory accommodation or why not? If it would have worked and if the parties had finished talking it through, that was on the table. That was being discussed at the meeting on January 4th of 2011, but it was never resolved and they terminated. It was not, it was never affirmatively resolved. Now, my guys had grave concerns that any horse would have reacted that way, but I don't believe that the parties had exhausted their discussions on it before we were terminated. So as to the question about whether or not this was a safety issue, my case, the case that I tried, was absolutely fixated like a laser on the safety implications of what was going on. And I think the most important exhibit was number 57, which was an e-mail that Robbie Donnert sent to the owner, Ms. Feld, in which he said in spades that this is a safety concern. And she never responded to that. She instead sent in her folks who basically issued an edict that it's going to be one of these three things, and our folks did not regard any of those things as solving what the safety problem was, and hence the loggerheads that prompted them to terminate my clients. Feld tries to paint your clients as prima donnas who are not satisfied with anything. And they say your whole strategy here was to get back to the gold ring, the one ring show, that you didn't like being in the three ring circus, you want to get back to the gold ring, and so you were picking it at everything in order to accomplish that goal. What do you say in response to that? I say that they attempted to argue that to the jury, and I would further say that the jury probably disagreed with them, but that was ultimately for the jury to decide what our motivations were and whether or not they were legitimate, and the jury assessed it and reached the result that they did. You did want to get back to the gold ring. My folks wanted to make a living, and they found themselves on the short end of a two-year contract with no job prospects whatsoever, and given a choice between continuing to work for the next two years and being out on their tail, they would have chosen to work. They were not given that choice. I'm going to transition to the points behind my cross-appeal, if I may. We've raised two issues in our cross-appeal. The first one was a ruling related to a motion, preliminary motion to dismiss, in which a retaliatory personnel Florida statute was stricken from our complaint, and that was done on the basis that there is a choice of law provision in both the employment contract as well as the lease of act contract, and there's a significant difference between those two choice of all clauses, and most importantly, the employment law contract does not have a disqualifier related to Virginia choice of law. It says, in effect, and I'm paraphrasing, Virginia law is going to apply, but there is no comma except for Virginia's choice of law principles. That's different from how the lease is phrased. The lease has that more common carve-out in which Virginia choice of law principles would not apply. Under the employment contract, which was the nature of the claim that we've asserted here for breach of contract, without that carve-out, and even under the lease provision that does contain the carve-out, there are multiple reasons why this Florida statute lived and should have been submitted to the jury as part of the trial in this case. The most important of which is that Virginia law recognizes that a statute affecting performance is always incorporated as a contract term, and that's what was happening here. Virginia courts have established that principle, and in this instance, the Florida retaliatory personnel action statute actually affects the performance that's required in this case. The Florida statute obligated Feld to provide or to avoid retaliatory personnel actions, which incorporate any law or regulation, and we believe that that would have incorporated the OSHA provision, which allows us to assert a claim based on a good faith belief that there is a legitimate safety issue here, and we absolutely believe that. That's what our testimony was, that having a horse that has gone out of control raised a safety issue for the human performers or anyone else that was in the area, because if that horse took off, it could kick, it could bite, it could run over, it could knock over anybody else who happened to be in the area. Further, Virginia law has established that the law of other states, their statutes, are incorporated by comedy when it involves enforcing of a contract, and we believe that that also was the case here. And then lastly, Virginia law establishes that a choice of law clause cannot waive a statutory right. Given that the termination occurred in Florida, it was Florida that had the superior interest in this, the greater interest in enforcing its anti-retaliation statute, and that therefore should have been submitted to the jury, and the choice of law clause under Virginia law cannot be used to deprive us of a remedy, which is exactly what happened here. We had a remedy that was available. You had a similar remedy, maybe not as robust under Virginia law if you wanted it. There's a retaliation statute in Virginia, wasn't there? Not that would have applied under these circumstances. Because there's no exhaustion? Well, first of all, it has a severe time restriction on it, and secondly, it doesn't incorporate and give us the benefit of the good faith standard that OSHA does. So there's a substantive distinction that we would not have been able to assert a viable claim under the Virginia statute because it doesn't incorporate that good faith belief as a basis in the way that OSHA does, which we could then build into the basis for a Florida violation. Going to the second point that we have raised on our cross appeal. In this instance, there were a series of rulings that were assigned to the magistrate judge, and early on the magistrate judge entered a document preclusion order, and we were prepared to live with that document preclusion order, in effect, because we already knew we didn't have any documents on it, so it really didn't change the game in a material way. The issue was raised several times thereafter in subsequent motions, and in the subsequent hearings, Feld attempted to expand it from a document preclusion order to an issue preclusion order. Very different, because we did have evidence, and we intended to introduce to expert testimony what the value was for the care, feed, especially six of them. And so changing it from a document preclusion order to an issue preclusion order was extremely important to us, and it was raised three different times to the same magistrate judge, and each time he indicated, no, I'm not going to give you what you're asking for. I have already ordered that the documents, if they existed, which they did not, are precluded, and he expressly refused to extend it as an issue preclusion order. That was then, as recently as I believe it was a week before trial, resubmitted to the same magistrate judge, again asking him to issue an issue preclusion order, which there was a tiny little piece related to a tax return. He said, if they don't get the tax return within, I believe it was two days, then I'm going to revisit the issue preclusion order. I'm taking it under advisement. Feld did not go back to the magistrate judge to whom discovery issues had already been delegated. Instead, Feld filed a motion in limine asserting what the magistrate judge, who had the issue delegated to him, had refused to do, asserting that there needed to be an issue preclusion order in this case. And the trial court interpreted the original comment from the magistrate judge at the May 2013 discovery order as having, in fact, issued an issue preclusion order, which is not what it was, and he had reaffirmed over and over and over again that he had not done so. And that prompted the judge, without performing the proper analysis under Rule 72, without determining that there was a clear error or that the magistrate judge's ruling was contrary to law, proceeded to enter for the first time on the day before trial an issue preclusion order that precluded all of our evidence, including the expert testimony that we had intended to offer to show the $121,000 that would have fallen under the contract as out-of-pocket recovery for expenses related to the care and maintenance of these horses. And we believe that the trial judge should not have done that, that it was an issue that had been delegated to the magistrate judge and that only if the trial court had received timely objections, which it did not receive, it did not receive objections at any time, and if those timely objections had then been found to show clear error or that the magistrate judge's ruling was contrary to law, would the trial court then have been free to do what it did, which was to issue a preclusion order. Those things had not happened. In fact, they had actually testified at their corporate representative deposition that they didn't have evidence, they weren't taking a position on damages. And it wasn't until literally the day before trial that this issue preclusion was ordered. You didn't have any documents relating to these damages? Wouldn't you have the bills for the hay and the tending and the serving, paying the salaries of people who rush and clean the horses and so forth? All of those are documents relating to that, aren't they? We didn't have them, though. I'm not saying that they never existed. You didn't have them right where, because you were on the road? We no longer had them to be able to produce. They were not in our possession. We could not locate them. If we had retained them, they were no longer in our control. Well, how about your clients? That's what I'm saying, Your Honor. We searched, and if we had ever saved them— Why were sanctions issued? The court must have thought differently, that you had documents and weren't producing them. I disagree with that, Your Honor. Why don't you have sanctions? There would be no sanctions if you don't have documents. You say, I don't have any documents. That's it. Well, and we said that. We went to the hearing. We said we don't have any documents on these topics. And the judge said, all right, whatever you have, whatever you don't have, if it's not produced by, I think it was two or three days later, we're precluded. And we already knew that we didn't have those, so we lived with it. Okay. Unless there's any other questions from the court? No, please. Thank you, Mr. Pierce. Okay. Mr. Porter. Thank you. I wanted to address a few things that were raised in my colleague's argument.  And it's been made in other places that these horses were going out of control. But there is absolutely no evidence of that anywhere within the record. The only evidence was the horse bit and the horse jumped up from under the blanket prematurely? The evidence was that at one friends and family event, the horse jumped up a little bit early, and David Donard, who was the performer handling it, his testimony was he got stepped on. That's the extent of it. Well, I understand, but there's evidence. But you can't say there's no evidence. I apologize, sir. I didn't mean to overstate it. What I meant was the statement that the horses are out of control. Well, if a horse jumps up prematurely and also snips, there's something going on. I mean, it's not out of control, but that's not a good thing to a person who manages horses, I would think. And remember that the evidence also was that all of this occurred many minutes. I think it was seven to eight minutes after the tigers had long passed out of the arena. The lying down incident or the lying down trick happens at the very end. Well, that's an actual question. That's right. When does the sniff get there? That's right. And the evidence with respect to scent and sound was, I believe, undisputed by their clients at trial when they said that they solved both the issues with the cage and the issues with the scent. So those were the only two issues that were ever raised from a safety standpoint. Would you address the document issues? Yes, sir. Your colleague says that he made it clear he didn't have any documents. They couldn't produce them, and there weren't any. So basically the magistrate judge is saying, okay, don't come up in the last minute with them. Don't produce them. He says that's been converted into a sanction precluding the proof of damages. I disagree with that. Okay. This is how the document issue played out. It was a constant struggle to get information in this case from the plaintiffs. We filed one motion to compel, and I think we were before the court on oral argument three times on motions for sanctions. We requested material relating to their damages, and we requested material relating to their attempts to mitigate their damages. When we appeared before the magistrate judge with respect to both of these issues, we were told that there were no documents with respect to either category, and magistrate judge Jones entered an order. He said that any claim for damages for any out-of-pocket expenses for bills or anything else for which they didn't produce can't be used. All of the other arguments related to our constant request to try and get information related to mitigation because we would get discovery responses that said none, and then we'd go for the motion to compel, and they'd say we have none. And then we'd get to the deposition, and the clients would say, of course we have. Yeah, we have stuff. The district court and magistrate judge were quite frustrated, it seemed to me, because they wanted the information, never got it. They felt that the litigants were dilatory in not presenting supporting information. So it wasn't as if they weren't given a chance. Absolutely. They were given lots of chances. Magistrate judge Jones was unbelievably patient with his approach to this, and I think that's reflected in the transcript. And he gave them a number of what I call today second chances to try and solve the problem. But all of that, and with respect to your question with respect to sanctions and why sanctions were ordered, it was because of the material related to mitigation. Because we knew it existed. We believed them to have it. We had no ability to get it other than through third-party subpoenas, which we ended up doing. How were you requesting that, through interrogatory answers or documents also? Yes, sir, both. Both. And then we ended up going out to third parties and generating the material ourselves. But I think what frustrated the judge, and I know it frustrated me, was getting the answer no to a discovery response, getting the answer no documents exist at a motion to compel, deposing the clients and them saying, yeah, we have that material, and then coming back to the court and we had a motions hearing on the motion for sanctions where while they said that they had the material, they hadn't looked for it. And the reason they hadn't looked for it is because they're circus performers who work on the road and they don't have time to look for it. And my position was, well, you brought this claim and you're seeking a lot of money and we'd like to know what your claim is or what income you were able to generate after you left the circus, at least for mitigation purposes. With respect to the damages element of it, we never received any information with respect to that, what they may have spent on hay, feed, and the like. Never got that. And the other part of it, which was included at the motion for sanctions stage and at the motion to eliminate stage, was that the reason they didn't have it is because they got rid of the horses. So they never incurred those damages. And they were seeking, and this was true with the argument to the district court judge, and I think, may I finish my response? One of the reasons why he lost his patience a little bit is because they had six horses. I think they had gotten rid of at least four of them, maybe more, almost immediately after the contract with Feld ended. So they were proceeding with a claim for damages that they never incurred. Any further questions? Thank you. Thank you very much. And I will ask the clerk to adjourn court, and we'll come down and brief counsel. This honorable court stands adjourned until tomorrow morning at 9 o'clock. God save the United States and this honorable court.
judges: William B. Traxler, Jr., J. Harvie Wilkinson III, Paul V. Niemeyer